No: 23-2139

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

LARRY GOLDEN
*Petitioner*

v.

THE UNITED STATES
*Defendant*

**RECEIVED**

JUL 1 2 2023

United States Court of Appeals
For the Federal Circuit

ON APPEAL FROM THE UNITED STATES COURT OF FEDERAL CLAIMS
IN 1:23-cv-00185-EGB (23-185C)
JUDGE ERIC G. BRUGGINK

## PLAINTIFF-APPELLANT'S INFORMAL BRIEF

LARRY GOLDEN
740 Woodruff Rd., #1102
Greenville, S.C. 29607
(864-288-5605)
Atpg-tech@charter.net

Appearing Pro Se

July 11, 2023

# Content Page

[Pg.01] REVIEW OF FIFTH AMENDMENT "TAKINGS" LAW

[Pg.01] THE TRIAL COURT ERRED IN DISMISSING PLAINTIFF'S COMPLAINT FOR LACK OF JURISDICTION UNDER THE SIX-YEAR STATUTE OF LIMITATIONS

[Pg.04] SYSTEMIC RACISM / INSTITUTIONAL RACISM

[Pg.04] WILLFULLY BLIND / RETALIATION

[Pg.05] GOLDEN FACTUALLY "BEGGED" THE DOJ, DHS, & PTAB NOT TO "TAKE" GOLDEN'S PATENT CLAIMS WITH UNQUALIFIED PATENT REFERENCES

[Pg.06] PATENT OWNER'S PRELIMINARY RESPONSE (Paper 10)

[Pg.06] ORDER Conduct of the Proceeding 37 C.F.R. § 42.5 (Paper 23)

[Pg.07] PATENT OWNER'S RESPONSE (Paper 24)

[Pg.07] PATENT OWNER'S NON-CONTINGENT MOTION TO AMEND (Paper 25)

[Pg.08] PATENT OWNER'S RESPONSE: "MOTION TO AMEND" (Paper 26)

[Pg.08] ORDER Conduct of the Proceeding 37 C.F.R. § 42.5 (Paper 29)

[Pg.09] PATENT OWNER'S REPLY TO PETITIONER'S OPPOSITION TO PATENT OWNER'S MOTION TO AMEND CLAIMS (Paper 33)

[Pg.10] FINAL WRITTEN DECISION 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 (Paper 35)

[Pg.11] PATENT OWNER'S REQUEST FOR REHEARING (Paper 36)

[Pg.12] MOTIVE FOR THE "GOVERNMENT" THE UNITED STATES TO TAKE GOLDEN'S PROPERTY FOR USE WITH THE PUBLIC WITHOUT PAYING "JUST COMPENSATION"

[Pg.14] Members of Congress who Verified the Intellectual Property Subject Matter of Golden's Patents and Inventions are *NOT* Frivolous

[Pg.15] Government Agencies who Verified the Intellectual Property Subject Matter of Golden's Patents and Inventions are *NOT* Frivolous

[Pg.18] Private Entities who Verified the Intellectual Property Subject Matter of Golden's Patents and Inventions are *NOT* Frivolous by Commercializing Allegedly Infringing Products

[Pg.22] When compared to Google, Two Federal Circuit Judges Nominated by President Obama (Taranto and Stoll) Verified the Intellectual Property Subject Matter of Golden's Patents and Inventions are *NOT* Frivolous

[Pg.23] Team Collaboration Agreements with "People Skilled in the Art" who Verified the Intellectual Property Subject Matter of Golden's Patents and Inventions are *NOT* Frivolous

[Pg.23] Dr. Thomas J. Bonazza, Ph.D.

[Pg.23] Dr. Lonnie Johnson, (Inventor)

[Pg.23] Dr. Santosh Pandey, Ph.D.

[Pg.23] Harold P. Kimball Jr. (Software Developer)

[Pg.24] Doug Erwin Cumbie (Computer & Electrical Engineer)

[Pg.24] Dr. Gilbert E. Pacey, Ph.D. (IDCAST)

[Pg.25] Dr. Guru Subramanyam, Ph.D. (IDCAST)

[Pg.25] Dr. Wolfgang U. Spendel, Ph.D. (IDCAST)

[Pg.25] Dr. William H. Steinecker, Ph.D. (IDCAST)

[Pg.28] THE GOVERNMENT'S RETALIATION *NEVER* STOPPED WHICH MEANS THE GOVERNMENT'S "TAKINGS' OF GOLDEN'S PROPERTY UNDER THE FIFTH AMENDMENT CLAUSED OF THE UNITED STATES CONSTITUTION *NEVER* STOPPED

[Pg.30] CONCLUSION

[Attached] PLAINTIFF-APPELLANT'S INFORMAL APPENDIX

# REVIEW OF FIFTH AMENDMENT "TAKINGS" LAW

Government "takes" property either by eminent domain (a/k/a "direct condemnation") or by regulating its use so severely as to eliminate or at least substantially reduce its value, but claiming to do so for the public good, and not paying compensation (called "inverse condemnation" or a "regulatory," as opposed to physical, taking).

For Golden to prove a taking and entitlement to just compensation, Golden, the property owner, must demonstrate the adverse impact on value (which must be substantial, if not total); interference with "reasonable investment-backed expectations" **[Informal Appendix-Proposal for the Congressional Black Caucus\*]**; and the "character" of the government's action.

Throughout this informal brief, and the attached informal appendix, Golden has overwhelmingly demonstrated how the Government's actions has adversely impacted the value of Golden's property; how the Government has interfered with Golden's "reasonable investment-backed expectations"; and the "character" of the government's action.

The character of the government's action is also applied to external factors of systemic and institutional racism; discrimination; retaliation; willful blindness; and violation(s) of Golden's procedural due process.

The Circuit Court then balances these factors to determine whether the Government, by its regulation, is effectively imposing on Golden, a burden of lost value for which, in fairness, the government/public should pay. The outcome of this "takings" case, of course, depends on the facts, but at this point the standards have been reasonably defined by Federal Courts.

# THE TRIAL COURT ERRED IN DISMISSING PLAINTIFF'S COMPLAINT FOR LACK OF JURISDICTION UNDER THE SIX-YEAR STATUTE OF LIMITATIONS

Takings suits against United States are filed in federal courts of general jurisdiction; "takings" suits against the United States are filed in a single, specialized court: the U.S. COFC.

---

\* The proposal is included to illustrate the extent of damages the Government has caused with the "takings" of Golden's property. Members of Congress gave DHS Golden's intellectual property subject matter. DHS gave Apple, Samsung, LG, & Qualcomm Golden's intellectual property subject matter in 2007-08 for commercialization. The proposal illustrates a stimulus that included African Americans. Damage: Golden's net income would exceed $200 billion. ATPG TECH would value exceed $1 trillion. ATPG Corp. [for 50M Blacks] would exceed $8 trillion.

Within the six-year period from *10/01/2015*, Golden filed in the United States Court of Federal Claims, on *01/17/2019* in *Larry Golden v. United States* Case No. 1:19-cv-00104-EGB, Golden initiated the filing of an Unconstitutional IPR-Based Takings claim against the Government, the United States.

In *Larry Golden v. United States* Case No. 1:19-cv-00104-EGB *OPINION*. Document: 12 Page: 4 Filed: *05/14/2019*. The United States Court of Federal Claims responded to the Government's Motion to Dismiss for lack of jurisdiction: "Finally, as we held in the related action, plaintiff fails to state a claim to the extent that his complaint alleges a taking by the actions of this court, the Federal Circuit, or the PTAB." ... "Plaintiff appears to argue that the cancellation of his '990 independent claims in the IPR at the PTAB constitutes a taking by the PTAB." ... "In sum, plaintiff's takings claim duplicates his related patent action in Docket No. 13-307C, asserts claims over which this court does not have jurisdiction, and fails to state a takings claim. Defendant's Motion is granted pursuant to Rule12(b)(1) and Rule12(b)(1)."

"On Appeal from the United States Court of Federal Claims in No. 1:19-cv-00104-EGB, Senior Judge Eric G. Bruggink, in the *OPINION* for *Larry Golden v. United States* CAFC Case No. 19-2134 Document: 37 Pages: 11-12 Filed: *04/10/2020*. The Federal Circuit clarified the COFC's jurisdiction:

"We next turn to Golden's IPR-based takings claims. We first address whether the Claims Court had jurisdiction to hear these claims. ... The government argues that the American Invents Act ("AIA")'s creation of inter partes review by the Board, followed by judicial review before this court, creates a "'self-executing remedial scheme' that 'supersedes the gap-filling role of the Tucker Act.'" Id. at 41 (quoting *United States v. Bormes*, 568 U.S. 6, 13 (2012))."

"According to the government, the AIA statutory scheme displaces Tucker Act jurisdiction because there is no procedural impediment to presentation of a takings claim to the agency and because the remedial scheme provides for judicial review of constitutional challenges to the agency's action. Id. at 43–49. The government's argument is without merit."

"In *Bormes*, the Supreme Court explained that Tucker Act jurisdiction is displaced "when a law assertedly imposing monetary liability on the United States contains its own judicial remedies." 568 U.S. at 12 (emphasis added). More recently, the Court explained

2

that, "[t]o determine whether a statutory scheme displaces Tucker Act jurisdiction, a court must 'examin[e] the purpose of the [statute], the entirety of its text, and the structure of review that it establishes." *Horne v. Dep't of Agric.*, 569 U.S. 513, 526–27 (2013) (quoting *United States v. Fausto*, 484 U.S. 439, 444 (1988)). Thus, when there is a precisely defined statutory framework for a claim that could be brought against the United States, the Tucker Act gives way to the more specific statutory scheme. Regardless of the structure of review it establishes, the AIA is not a statute that provides for claims against the United States."

"The government is correct that, under the AIA, parties may raise constitutional challenges in our court on appeal from Board decisions. But this remedial scheme does not convert the AIA into a statutory framework for claims against the United States. The AIA is by no means "a law assertedly imposing monetary liability on the United States." Borne, 568 U.S. at 12. Accordingly, we reject the government's argument that the AIA displaced Tucker Act jurisdiction over Golden's IPR-based takings claims."

In Golden's Motion for Leave to File a Motion for Summary Judgement *Larry Golden v. United States*, COFC Case 1:13-cv-00307-EGB Document 196 Filed *11/03/20*, Golden continued his efforts to get the DOJ and the COFC Court to address Golden's IPR-Based Takings claims. Golden could never be time barred when the Claim was still pending in an active case.

The DOJ, the Defendant, continued to defend against Golden's "Takings" claim. In the lead case *Larry Golden v. United States*, COFC Case 1:13-cv-00307-EGB the Government ("DOJ"), on behalf of the Department of Homeland Security ("DHS"), filed Document 238 on *07/08/2021*, "Defendant the United States' Notice Regarding Service of The Government's Preliminary Invalidity Contentions", with more unqualified patent and publications' references.

The Trial Court dismissed the lead case COFC 13-307C, without adjudicating Golden's "Unconstitutional IPR-Based "Takings" claim on *11/10/2021*, which "ripen" the takings claim.

When the United States causes injury to property, a property owner can sue in the Court of Federal Claims. This is a result of the Tucker Act, which waives the United States' sovereign immunity in the COFC only, *United States v. Mitchell*, 463 U.S. 206, 215-19 (1983). Significantly, a suit alleging a compensable taking in the Court of Federal Claims is viable as soon as government invades a property interest without proving a statutory compensation guarantee. *Kirby*, 467 U.S. at 5; Dow, 357 U.S. at 22. The claimant need not sue in another court to "ripen" the takings suit. As the Court stated long ago in *Great Falls Mfg. Co.*, 112 U.S. at 656

# SYSTEMIC RACISM / INSTITUTIONAL RACISM

Systemic racism unfairly elevates white people over everyone else. It influences how African-Americans are treated by the justice system but it can also affect property ownership, housing, education, and health care. White Americans still control over 85% of the country's wealth. Black Americans possess just over 4% and Latinos only possess 3%. White families on average possess ten times more wealth than a Black family.

Institutional racism is discrimination or unequal treatment on the basis of membership in a particular ethnic group (typically one that is a minority or marginalized), arising from systems, structures, or expectations that have become established within an institution or organization. Some examples are: Golden is "an African American who is only three-fifth human"; Golden is "an African American and therefore do not have the brains for inventing"; Golden is "an African American and is property, which means he can't own property"; it also means Golden "cannot sue a White man over property when Golden is in fact property".

Unless proven otherwise, Golden is the only African American Patent Owner that has ever been petitioned for *Inter Partes Review* at the PTAB by two Government agencies [the Department of Justice (DOJ) and the Department of Homeland Security (DHS)], who are not "persons" authorized to petition the PTAB to invalidate Golden's patents.

Unless proven otherwise, the DHS & DOJ has never petitioned the PTAB for *Inter Partes Review* of patent(s) owned by a White(s).

Unless proven otherwise, Golden is the only African American Patent Owner that has ever been petitioned for *Inter Partes Review* at the PTAB by two Government agencies [the Department of Justice (DOJ) and the Department of Homeland Security (DHS)], who are not "persons" authorized to petition the PTAB to invalidate patents; with three unqualified patent references [Astrin, Breed, and Mostov] that does not antedate Golden's patents.

Unless proven otherwise, the DHS & DOJ has never petitioned the PTAB for *Inter Partes Review* of patent(s) owned by a White(s) with any number of unqualified references.

# WILLFULLY BLIND / RETALIATION

Golden believes the DHS & DOJ knew, should have known, or was willfully blind by intentionally keeping themselves unaware of facts that would render them liable or implicated.

4

The DOJ & DHS were Defendants in the lead case *Golden v. US* Case No. 13-307C where the petition for *inter partes review* originated from. The DOJ & DHS knew they were not "persons" authorized to petition the PTAB with unqualified patent references, and knew that their filing with the PTAB initiated the "takings" of Golden's property under the Fifth Amendment Clause of the Constitution without paying "just compensation".

Willfully Blind is also known as conscious avoidance, and is a judicially-made doctrine that expands the definition of knowledge to include closing one's eyes to the high probability a fact exists. In *United States v. Jewell*, the court held that proof of willful ignorance satisfied the requirement of knowledge. In 2011, with the civil patent infringement case *Global-Tech Appliances, Inc. v. SEB S.A.*, the Supreme Court affirmed the validity of the willful blindness doctrine in both civil and criminal settings, "[T]he court's observation that its definition "give[s] willful blindness an approximately limited scope that surpasses 'recklessness and negligence' is an important one".

Golden believes the Department of Homeland Security ("DHS") and the Department of Justice ("DOJ") retaliated against the Patent Owner for filing a claim of a Fifth Amendment "Takings" of Plaintiff's property and Government Patent Infringement in 2013, by filing the *inter partes review* (IPR) in 2014. Golden also believes the retaliation resulted in an Unconstitutional IPR-Based "Takings".

The Supreme Court has defined retaliation as an intentional act in response to a protected action. It carries with it the notion of "getting even." As noted in a 2011 law review article: "Retaliation is a deliberate action used to send a clear message that complaining is unwelcome and risky. It is employed to instill fear in others who might consider making a complaint in the future. Those with cause for complaining are frequently among the most vulnerable in an institution. Once they complain, they are labeled 'trouble-makers'. Retaliation, and the fear of retaliation, becomes a potent weapon used to maintain the power structure within the institution." Ivan E. Bodensteiner, *The Risk of Complaining Retaliation*, 38 J.C. & U.L. 1, 1 (2011).

## GOLDEN FACTUALLY "BEGGED" THE DOJ, DHS, & PTAB NOT TO "TAKE" GOLDEN'S PATENT CLAIMS WITH UNQUALIFIED PATENT REFERENCES

Golden request "Judicial Notice" in the Trial Court Case No. 23-185C, Filed 04/20/2023 Dkt. 9, in *Larry Golden v. The United States*; of the following papers filed in the *Inter Partes Review* (IPR) Trial of *United States Department of Homeland Security v. Larry Golden*; Case IPR2014-00714; U.S. Patent No. RE043,990. **[Informal Appendix-IPR Papers]**

**PATENT OWNER'S PRELIMINARY RESPONSE (Paper 10).** The anticipation basis describes whether the reference is being considered for by its publication date or its priority date. The Patent Owner repeated the DHS/DOJ's anticipation basis in a chart distinguishing: Reference Filing Date / Publication Date (i.e., 120(b)) / Basis for anticipation—Priority Date (102(e)), for U.S. Patent Application Publication No. 2006/0250235 ("Astrin") Publication Date 11/09/2006 Basis 102(b); U.S. Patent Application Publication No. 2006/0181413 ("Mostov") Publication Date 08/17/2006 Basis 102(b); and, U.S. Patent No. 7,961,094 ("Breed") Priority Date 11/29/2007 Basis 102(e). With this disclosure in a preliminary response to the DHS/DOJ's petition for Inter Partes Review (IPR), and the DHS/DOJ's unwillingness to correct their mistake, signifies the DHS/DOJ was willfully blind by intentionally keeping themselves unaware of facts that would render them liable or implicated.

**ORDER Conduct of the Proceeding 37 C.F.R. § 42.5 (Paper 23).** "We noted that, while we are not constraining what Mr. Golden can argue in the Patent Owner Response, he may be best served by focusing on the challenges on which trial was instituted" [*the PO understood this to mean, the PTAB did recognize Astrin, Breed, & Mostov as being unqualified references, and that the PO had better focus on the challenge of showing how the PO's patent claims was not antedated by the unqualified references*]; "If the Motion to Amend is non-contingent, Mr. Golden is, in essence, abandoning the claims at issue, and saying that we should only look at the claims as amended in the Motion to Amend" [*if the Motion to Amend was non-contingent, and the PO was abandoning the claims at issue, and the PO's intention was to submit new substitute claims, the PO would have stated that in his Motion to Amend submitted on January 7, 2015— but he did not*]; "Mr. Golden has the burden to show a patentable distinction for each proposed substitute claim over the prior art" [*not possible, the way anticipation works is the references of Astrin, Breed, & Mostov has a priority date that antedates the PO's priority date for the RE43,990 patent asserted in the IPR, but because the references of Astrin, Breed, & Mostov priority date does not antedate the PO's priority date for the RE43,990 patent, it is procedurally impossible*]; "In addition, if Mr. Golden is relying on any priority documents to establish an

effective filing date, he should also point to where support occurs in those priority documents" *[the only priority document the PO needed to show priority over Astrin, Breed, & Mostov's "basis for anticipation" was the PO's patent no. RE43,990 asserted in the IPR]* ...

**PATENT OWNER'S RESPONSE (Paper 24)**. "The PO again presented the DHS/DOJ with an opportunity to correct their mistake in the Patent Owner's Response, "[t]hus, the '990 patent antedates Astrin (published on 11/09/2006) and Mostov (published on 08/17/2006), thus resulting in both being ineligible as prior art under 102(b), and antedates Breed (filed on 11/29/2007), thus resulting in it being ineligible as prior art under 102(e)." With this disclosure in the Patent Owner's Response, and the DHS/DOJ's unwillingness to correct their mistake, signifies the DHS/DOJ was willfully blind by intentionally keeping themselves unaware of facts that would render them liable or implicated. It can also be said that, at this point the DHS/DOJ knew, or should have known, the references of Astrin, Breed, & Mostov does not antedate the priority date of the PO's '990 patent.

**PATENT OWNER'S NON-CONTINGENT MOTION TO AMEND CLAIMS (Paper 25)**. Again, the PO tried to get the PTAB to respond to the PO's claim that the references of Astrin, Breed, and Mostov does not antedate the PO's '990 patent, "Patent Owner's date of invention is at least as early as April 5, 2006 which is before the publication dates of Astrin and Mostov, and the filing date of Breed." With this disclosure in the Patent Owner's Non-Contingent Motion to Amend Claims, and the DHS/DOJ's unwillingness to correct their mistake, signifies the DHS/DOJ was willfully blind by intentionally keeping themselves unaware of facts that would render them liable or implicated. It can also be said that, at this point the DHS/DOJ knew, or should have known, the references of Astrin, Breed, & Mostov does not antedate the priority date of the PO's '990 patent.

In a motion to amend, the PO bears the burden to show a patentable distinction of each proposed substitute claim over the [unqualified] prior art. See 37 C.F.R. § 42.20(c). To that end, the Patent Owner sent the references of Astrin, Breed, and Mostov over to the USPTO for examination. The Examiner writes "[t]he references of petitioner DHS such as Exhibit 1005, 1169, US patent No. 5,959,529 and 7,148,484 and US application No. 13/701,449 do not relevant to the independent claims as a whole. They just had one or more elements in the claimed limitations but do not meet as a whole invention", which means, even if the references of Astrin, Breed, and Mostov were qualified prior art to the PO's '990 patent; according to the USPTO the

claims at issue and the substitute claims are patentable and allowable. The PTAB refused to acknowledge the findings of the USPTO. This too was another opportunity for the DHS/DOJ to correct their mistake, but instead they chose to continue retaliating to take the PO's property.

Because the references of Astrin, Breed, and Mostov do not antedate the PO's '990 patent, the only thing that was accomplished in the DHS/DOJ's *inter partes review* is the demonstration of how the patents of Astrin, Breed, and Mostov are invalid because the subject matter is anticipated by the PO's '497 patent.

**PATENT OWNER'S RESPONSE: "MOTION TO AMEND" (Paper 26)**. Equally, in the Patent Owner's Response: "Motion to Amend", "Petitioner asserted that Astrin was available as prior art under 35 U.S.C. §102(b) as of November 9, 2006 upon publication. Petition for Inter Partes Review of U.S. Patent No. RE43,990 Under 35 U.S.C. §312 and 37 C.F.R. §42.104, page 2, lines 12-14. This date is after Patent Owner's priority date of April 5, 2006, and Astrin is therefore disqualified as prior art under 35 U.S.C. §102(b) and cannot be applied against claims 11, 74 or 81 because this publication date is not more than one year before Patent Owner's filing date. Petitioner asserted Mostov as prior art under 35 U.S.C. §102(b) as well and stated that this publication date was August 17, 2006. Petition, page 3, lines 1-3. As August 17, 2006 is not more than one year before, but is in fact after, Patent Owner's filing date of April 5, 2006, Mostov is likewise disqualified as prior art under 35 U.S.C. §102(b). Petitioner also asserted Breed as prior art under 35 U.S.C. §102(e) and stated that the filing date of the application of Breed was November 29, 2007. Petition, page 3, lines 4-6. Patent Owner's date of invention is at least as early as April 5, 2006 which is before the filing date of November 29, 2007 of Breed and likewise this reference is not prior art to claims 11, 74 and 81 under 35 U.S.C. §102(e). With this disclosure in the Patent Owner's Response: "Motion to Amend", and the DHS/DOJ's unwillingness to correct their mistake, signifies the DHS/DOJ was willfully blind by intentionally keeping themselves unaware of facts that would render them liable or implicated. It can also be said that, at this point the DHS/DOJ knew, or should have known, the references of Astrin, Breed, & Mostov does not antedate the priority date of the PO's '990 patent.

**ORDER Conduct of the Proceeding 37 C.F.R. § 42.5 (Paper 29)**. The PO never really understood how to amend claims to overcome 102-antipation objections when the references do not actually antedate the patent at issue: "Petitioner initiated the conference call … In its e-mail requesting the call, Petitioner stated that Patent Owner filed both a contingent and a non-

contingent Motion to Amend, while only a single motion was authorized by rule. See 37 C.F.R. § 42.121(a) (stating that a "patent owner may file one motion to amend a patent") ... We noted also that Mr. Golden had filed two papers with respect to the motion to amend—Paper 25, titled "Non-Contingent Motion to Amend," and Paper 26, titled "Motion to Amend Claims." Mr. Golden stated that he was unclear as to how the Motion to Amend should be designated as a noncontingent motion to amend, and thus, in an abundance of caution, he filed a separate paper designating the motion as non-contingent ... As both papers collectively appear to meet the page limit for a motion to amend, we will treat them in the collective as a single motion to amend. Petitioner does not oppose ... Accordingly, it is ORDERED that Papers 25 and 26 will collectively be treated as a single, non-contingent, Motion to Amend, with the proposed claim amendments being set forth in Exhibit 2020". It was the Judge who decided the PO's Motion to Amend was non-contingent; not the Patent Owner. [1]

**PATENT OWNER'S REPLY TO PETITIONER'S OPPOSITION TO PATENT OWNER'S MOTION TO AMEND CLAIMS (Paper 33)**. I. SUBSTITUTION CLAIMS ANTEDATES THE PRIOR ART ... 3 – 15. "The amendment makes the prior art of Astrin and Breed unavailable because the subject matter antedates Astrin's publication date and Breed's application filing." Therefore, it is irrelevant that the original claims at issue was cancelled; relevant is the fact that "But For" the DHS/DOJ's "willful blindness", and the multiple opportunities the DHS/DOJ had to correct their mistakes, the IPR would not have been instituted or the IPR would have been withdrawn before the "Final Written Decision".

It can be said that, at this point the DHS/DOJ knew, or should have known, the references of Astrin, Breed, & Mostov does not antedate the priority date of the PO's '990 patent.

The references of Astrin, Breed, & Mostov does not antedate the substitute claims asserted in the IPR.

---

[1] While the Defendant ("Government") is trying to redirect and narrow this case to Golden's cancellation of patent claims, as a justifiable means of taking Golden's property, it is not. The Defendant's attention should be on whether or not it is time to tell the truth about petitioning the PTAB as a "person" unauthorized to do so; petitioning the PTAB with unqualified references; petitioning the PTAB as a "person" unauthorized to do so, with unqualified references as a way to retaliate against the Plaintiff for filing a complaint against the Government; being "willfully blind" to the many, many times the Patent Owner / Golden tried to get the Government to respond to the PO's claim that the references did not antedate, and Golden's claim of an Unconstitutional IPR-Based "Taking"; and violating Golden's procedural "Due Process".

First, it is recognized further that it was the PTAB Judges who selected the "Non-Contingent Motion to Amend with unqualified references that do not antedate the PO's '990 patent, "On January 13, 2015, Patent Owner filed a Patent Owner Response (Paper 24 ("PO Resp.")), a Non-Contingent Motion to Amend (Paper 25 ("Non-Cont. Mot. to Amend")), and a Motion to Amend (Paper 26 ("Mot. to Amend"))" … "The Patent Owner Response contains arguments directed both to claims 11, 74, and 81 and to the proposed substitute claims. To the extent Patent Owner argues the patentability of claims 11, 74, and 81, those arguments are moot because Patent Owner has cancelled those claims. To the extent that Patent Owner wishes us to apply the arguments made regarding claims 11, 74, and 81 to the patentability of the amended claims or incorporate arguments regarding claims 154–156 from the Patent Owner Response into the Motion to Amend, we decline to do so … Patent Owner is precluded from incorporating arguments regarding the patentability of claims 11, 74, and 81 from the Patent Owner Response into the Motion to Amend to address how proposed substitute claims 154–156 are patentable". But yet, it was the PTAB Judges who combined the two motions and decided for the PO that the two motions will be considered a non-contingent motion to amend.

Second, it was only in the "Final Written Decision" that the PTAB Judges addressed the references of Astrin and Breed as unqualified references that do not antedate original claims at issue and the substitute claims of the '990 patent, "We next consider Patent Owner's argument that Astrin, Mostov, and Breed are not prior art because the amended claims are entitled to the April 5, 2006 priority date. Mot. to Amend 2–7. Even accepting, for the sake of argument, that the substitute claims are entitled to this earlier priority date, at the very least, Mostov remains prior art under 35 U.S.C. § 102(e) because Mostov's non-provisional filing date is January 30, 2006. Ex. 1003, at [22]". The DHS/DOJ should not have petitioned with Astrin and Breed, and the PTAB should not have instituted with Astrin and Breed, which resulted in the unconstitutional "takings" of the Patent Owner's property.

Third, when the PTAB changed the anticipation basis of Mostov from that of 35 U.S.C. § 102(b) to that of 35 U.S.C. § 102(e), the PTAB literally instituted a new trial, "Mostov remains prior art under 35 U.S.C. § 102(e) … The fact that we did not institute this proceeding on Mostov does not mean it is no longer relevant to the patentability of the substitute claims". The PO demonstrated how Mostov with an anticipation basis of 102(b) do not antedate the priority

date of the '990 patent. If the PTAB was interested in changing the anticipation basis of Mostov, the PTAB should have done so when the PTAB instituted the case to trial. Not after the PO has defended his original claims at issue (i.e., 11, 74, & 81 of the '990 patent) against the unqualified patent references of Astrin and Breed.

**PATENT OWNER'S REQUEST FOR REHEARING (Paper 36).** With the following disclosure in the Patent Owner's Request for Rehearing", and the DHS/DOJ's unwillingness to correct their mistake, signifies the DHS/DOJ was willfully blind by intentionally keeping themselves unaware of facts that would render them liable or implicated. Email sent by the PO on October 2, 2015:

"Mostov, does not qualify as prior art to the Patent Owner's priority date of April 5, 2006 because Mostov was not made public (in a publication) until August 17, 2006. For this reason, the Patent Owner is asking the Board to reverse the 102(e)-anticipation rejection because the Petitioner never filed a 102(e) objection and the Patent Owner was never allowed to respond to a 102(e) objection."

"On page 26 of the "Final Written Decision" Mostov was re-entered because the Board, "consider Mostov still to be relevant to the patentability of the claims". The Board also states, "at the very least, Mostov remains prior art under 35 U.S.C. 102(e). It should be noted the Petitioner entered the Mostov patent into record under 35 U.S.C. 102(b) and not under 35 U.S.C. 102(e). (IPR Petition; content page and pages 3, 4, & 29). The Patent Owner doesn't recall ever having to respond to a motion made by the Petitioner to change its objection from a 102(b) objection to a 102(e) objection. The Patent Owner is totally unaware of any PTAB rule that would allow for such a change without the Patent Owner having a chance to respond to the amendment to the Petition."

"Mostov's patent provisional filing date is January 28, 2005. The Patent Owner's "Disclosure Document" filing date is November 26, 2004. Therefore, any subject matter Mostov has outlined in his claims, according to the Federal Circuit decision above, is anticipated by the Patent Owner because the Patent Owner's "Disclosure Document" antedates Mostov's patent provisional filing date. (Attached is a copy of the "Disclosure Document" submitted to the USPTO for the benefit of the Patent Owner that displays a USPTO stamped filing date and a stamped document no. of 565732 used for reference."

It can be said that, at this point the DHS/DOJ knew, or should have known, the reference of Mostov does not antedate the priority date of the PO's "Disclosure Document".

## MOTIVE FOR THE "GOVERNMENT" THE UNITED STATES TO TAKE GOLDEN'S PROPERTY FOR USE WITH THE PUBLIC WITHOUT PAYING "JUST COMPENSATION"

The Government the United States was very interested in implementing Golden's "targeted economic stimulus packages" (i.e., the "SafeRack" package; the "V-Tection" package; and the "ATPG" package).

The strategy for stimulating the economy under the "SafeRack" initiative, involves government spending for research and development; funding by way of awards and grants; and the development for the government certain devices and products for the detection of chemical, biological, radiological, nuclear, and explosives (CBRNE) compounds and agents.

The government was tasked with creating the demand for the CBRNE devices and systems. The demand sparks competition between the third-party contractors competing for the contracts to manufacture the devices, products, and systems "for the government". Through cooperative agreements the government can quickly get the devices, products, and systems commercialized.

The strategy for stimulating the economy under the "V-Tection" initiative, involved targeting the transportation industry. Golden's *remote* stall, stop, and vehicle slow-down system; and Golden's *pre-programmed* stall, stop, and vehicle slow-down system is targeted toward changing the course of transportation vehicles to that of driverless, self-drive, and autonomous vehicles.

The government was interested in Golden's technology for stalling, stopping, and slowing down vehicles because the driverless, self-drive, and autonomous vehicles can be equipped with the CBRNE devices, products, and systems and used by the military.

To satisfy the demand requirement and "use" of the technology developed under the "V-Tection" initiative, the government bailed out General Motors, Ford, and Chrysler. The "*bailout*" funds provided the original engineering manufacturers (OEMs) with tens of billions of dollars to make the gradual transition without going under.

The strategy for stimulating the economy under the <u>A</u>nti-<u>T</u>errorism <u>P</u>roduct <u>G</u>rouping "ATPG" initiative is to group *new, improved upon, and useful* inventions/products by common features of design similarities (i.e., cell phones, laptops, tablets, PCs, [smartphone], etc.) that's capable of communicating, monitoring, detecting, and controlling (CMDC).

The ATPG grouping strategy included integrating the devices, products, and systems, developed and commercialized under the "SafeRack" and "V-Tection" initiatives.

The Government satisfied the demand strategy of the "SafeRack" initiative when the Department of Homeland Security (DHS) issued DHS/S&T BAA07-10 *CELL-ALL Ubiquitous Biological and Chemical Sensing* request for proposals on 10/30/2007, "[f]or example, if biological and chemical sensors could be effectively integrated into common cell phone devices and made available to the American public on a voluntary basis, the Nation could potentially benefit from a sensor network with more than 240M sensors."

> "[e]nrolling members of the public could be seen as an entrepreneurial move on the part of DHS to exploit existing public resources, in the form of people with smartphones, to meet its narrowly defined public-safety objectives; as a Qualcomm representative argued: 'Let's take advantage of the 300 million cell phones that are out there today. They're always with us.'" Hoffman, D., 2011. Qualcomm Project Presentation. Cell-All Live Demonstration for Environmental Sensing (Webcast), September 28. <http://cellall.webcaston.tv/ home/homepage.php> (accessed 17.09.12)

The Government satisfied the demand strategy of the "V-Tection" initiative when the Department of Homeland Security, under the DHS/S&T BAA07-10 *CELL-ALL Ubiquitous Biological and Chemical Sensing* initiative, "secured Cooperative Research and Development Agreements with four primary cell phone manufacturers—Qualcomm, LG, Apple, and Samsung—with the objective of accelerating the 'commercialization of technology developed for government purposes'" (U.S. Department of Homeland Security, 2008).

Smartphones are being integrated into every piece of technology and autonomous vehicles are the new big thing. Smartphones are already being connected to regular cars with Bluetooth and AUX cords. Smartphones are expected to securely connect to driverless cars, as it is the most crucial factor. Here are some features that the integration between smartphones and driverless technology can offer that are already featured with standard vehicles:

- smartphones will be able to connect to autonomous vehicles from remote locations;

- the users will be able to use various apps to control the systems inside of their cars;

- drivers will be able to remotely lock and unlock their vehicles using a smartphone app;

- drivers will be able to find their vehicles in crowded parking lots;

- autonomous vehicle owners will be able to drive their vehicles with their smartphones;

- drivers will be able to slow down much faster with technology that has a much faster reaction time, and can even brake harder.

The Department of Homeland Security (DHS) and the Department of Justice (DOJ) realized they needed to discredit Golden's "targeted economic stimulus packages" (i.e., the "SafeRack" package; the "V-Tection" package; and the "ATPG" package) and invalidate the patented inventions of Golden to avoid liability for taking Golden's property for the benefit of the public, under the Fifth Amendment Clause of the U.S. Constitution, without paying just compensation.

Therefore, the DHS and DOJ, who are not "persons" authorized to petition the Patent Trials and Appeals Board (PTAB); was motivated to petition the PTAB in 2014 with the unqualified patent references of Astrin, Breed, and Mostov, eighteen publications, and an Expert's Declaration in support of the unqualified patents and publications references.

### Members of Congress who Verified the Intellectual Property Subject Matter of Golden's Patents and Inventions are *NOT* Frivolous

As a result of the 9/11 attacks, between the years 2003-2005, Golden submitted three (3) Economic Stimulus and Terrorism Prevention Packages, that included strategies for stimulating our economy as a whole and the African-American community, to at least that of President Bush, VP Cheney, and S.C. Senators Holland, DeMint, and Graham.

President Bush, VP Cheney, and S.C. Senators Holland, DeMint, and Graham sent the *nonfrivolous* "Economic Stimulus and Terrorism Prevention Packages", that included schematics for CBRNE detection devices (the "SafeRack" package); the schematics for a new, improved upon, and useful cell phone, PC, tablet, laptop, etc. (the "ATPG" package); and the schematics for a remote stop, stall, and vehicle slow-down system, and pre-programmed stopping, stalling, and slowing down of a vehicle (the "V-Tection" package), over to the Department of Homeland Security (DHS) for development and implementation.

Golden's evidence is the response letters Golden received from the offices of President Bush, VP Cheney, and S.C. Senators Holland, DeMint, and Graham.

The question here is, why would the leaders of our Nation send "*frivolous*" information over to the Department of Homeland Security (DHS) for implementation?

## Government Agencies who Verified the Intellectual Property Subject Matter of Golden's Patents and Inventions are *NOT* Frivolous

The United States Patent and Trademark Office (USPTO) has verified through examination the validity of eleven (11) patents issued to Golden that covers the intellectual property subject matter of Golden's inventions. 35 U.S. Code § 282(a) states In General. "A patent shall be presumed valid. Each claim of a patent (… independent, dependent, or multiple dependent …) shall be presumed valid independently of the validity of other claims". *See*, e.g., Universal *Marion Corp. v. Warner & Swasey Co.*, 354 F.2d 541, 544 (10th Cir. 1965) ("[A] party asserting invalidity on the ground of anticipation in the prior art, or for any other reason, has the burden of establishing such invalidity by clear and convincing evidence.").

Therefore, each and every time the Courts dismiss any of Golden's cases as *"frivolous"*, without the Defendants' having first presented their patent(s) invalidity contentions on a "clear and convincing evidence" standard; without a Markman Hearing and claim construction; and without a trial by jury as guaranteed by the Seventh Amendment of the United States Constitution is a complete violation of Golden's procedural due process. Procedural due process limits the federal courts' power by requiring certain procedures to be followed in civil matters.

The question here is, why would the Courts dismiss Golden's patents as "*frivolous*", given that the Fifth Amendment of the United States Constitution says to the federal government that no one shall be "deprived of life, liberty or property without due process of law."

Golden traveled to Colorado in 2006 for the Government Agencies (DoD, DOE, DHS, etc.) SBIR Tour. Golden meet with, and left behind copies of Golden's stimulus packages with Lisa Sabolewski, DHS SBIR Program Manager, who in turn asked Golden to send the information to her via email. (E-mail correspondence available).

Golden responded to an RFI in 2007 to the DHS/S&T Safe Container (SafeCon) Initiative, and discussed the intellectual property subject matter of Golden's inventions with DHS Margo Graves; margaret.graves@hq.dhs.gov, 202-379-8727. (E-mail correspondence available).

Golden traveled to Washington, DC in 2008 with his lead engineer [Harold Kimball] to discuss a "read-ahead" of Golden's intellectual property and the possibility of Golden incubating his company at the Department of Homeland Security (DHS). Golden and Mr. Kimball meet with Ed Turner, DHS/S&T Program Manager.

Golden submitted a proposal in 2007, in response to the DHS S&T *Cell-All Ubiquitous Biological and Chemical Sensing* request for proposals, and upon request, resubmitted Golden's intellectual property directly to the Stephen Dennis, DHS Program Manager for the *Cell-All Ubiquitous Biological and Chemical Sensing* initiative in 2008. (E-mail correspondence available).

Team Collaboration Agreement with Dr. Thomas G. Thundat who is a Corporate Fellow and the Leader of the Nanoscale Science and Devices Group at the Oak Ridge National Laboratory. He is also a Research Professor at the University of Tennessee, Knoxville, and a Visiting Professor at the University of Burgundy, France. He received his Ph.D. degree in physics from State University of New York at Albany in 1987. He is the author of over 220 publications in refereed journals, 45 book chapters, and 25 patents. Dr. Thundat's research is currently focused on novel physical, chemical, and biological detection using micro- and nano-mechanical sensors. His expertise includes physics and chemistry of interfaces, solid-liquid interface, biophysics, scanning probes, nanoscale phenomena, and quantum confined atoms. Golden was invited to spend the day with Dr. Thundat in 2006 to discuss his work.

Team Collaboration Agreement with Dr. Chris R. Taitt; Research Biochemist; Center for Bio/Molecular Science & Engineering, Naval Research Laboratory (NRL). Dr. Taitt and his team has developed an array biosensor for the rapid simultaneous analysis of multiple analytes in multiple samples. Applications include: Infectious disease diagnostics, Biological warfare defense, Food & beverage safety, Agriculture/veterinary testing, and Environmental monitoring.

Team Collaboration Agreement with Dr. Augustus Way Fountain III; U.S. Army Edgewood Chemical Biological Center is an Academy Professor in the Department of Chemistry and Life Science at the US Military Academy. He is a graduate of Stetson University and received the M.S. and Ph.D. degrees in analytical chemistry from Florida State University.

Golden was invited by DHS to Sacramento, CA in 2008 to attend a T.R.U.ST Industry Day Symposium. Golden discussed and left copies of his intellectual property subject matter with a selected panel. Golden was walked out by the Program Manager Dave Masters, where he

promised Golden, he will release a Request for Proposal in the near future that aligns with Golden's intellectual property technological rational.

| DHS/S&T "TRUST" INDUSTRY DAY | DHS/S&T "TRUST" COVERED AREAS |
|---|---|
|  | |

| DHS/S&T "TRUST" (BAA) 09-17 | DHS/S&T "TRUST" PROGRAM GOALS |
|---|---|

**U. S. Department of Homeland Security Science & Technology Directorate**



**Broad Agency Announcement (BAA) 09-17 "Time Recorded Ubiquitous Sensor Technologies" (TRUST)**

The Time Recorded Ubiquitous Sensor Technologies (TRUST) Project was initiated by DHS-S&T to solicit innovative solutions to detect and provide an alert to the presence of WMD…

DHS and several other agencies have identified the need to detect and identify weapons of mass destruction (WMD) …

Agency components such as Customs and Border Protection (CBP), United States Coast Guard (USCG), Transportation Security Administration (TSA), and others share a mission to secure our borders and transportation systems, from a devastating attack using WMD materials. Included with this BAA are study excerpts of environmental, threat, and signature studies performed by Massachusetts Institute of Technology (MIT)-Lincoln Laboratory (LL).

The system should detect: Weapons of Mass Destruction (WMD). Chemical Agents as defined by Center for Disease Control (CDC). Biological Agents as defined by Center for Disease Control (CDC) as Category A bioterrorism agents-diseases. Radiological and Nuclear Materials. Explosives (TNT, RDX, HMX, and PETN based). Human Stowaways by chemical detection means.

The Naval Air Systems Command (NAVAIR) provides materiel support for aircraft and airborne weapon systems for the United States Navy. It is one of the Echelon II Navy systems commands (SYSCOM), and was established in 1966 as the successor to the Navy's Bureau of Naval Weapons.

NAVAIR issued the NAVAIR 4.5 Counter Networks & Illicit Trafficking (CNIT) Program Office (4.5CNIT) Program and Operations Support on 25 January 2011. Examples of mission requirements include, but are not limited to: Development of electronic tracking devices; Analytical software; Airborne sensors; Ground Sensors; UAV modifications; Inspection systems; Unattended ground sensors; Foliage penetrating radar; Persistent surveillance; Fast boat detection; and Communication systems

SAIC's Jim Williford, VP Business Development - Global Preparedness, Science & Recovery Science Applications International Corporation (SAIC) and Mary E. John, Sr. Subcontracts Administrator for SAIC entered into a subcontractor's agreement with Golden's Anti-Terrorism Product Grouping (ATPG) Technology, LLC to respond to the NAVAIR CNIT solicitation and provide technology for the development of a Cell phone and communications sensor detection and lock disabling system. Golden expressed an interest in entering into a licensing agreement with SAIC.

SAIC is a FORTUNE 500(R) scientific, engineering, and technology applications company that uses its deep domain knowledge to solve problems of vital importance to the nation and the world, in national security, energy and the environment, critical infrastructure, and health. The company's approximately 45,000 employees serve customers in the U.S. Department of Defense, the intelligence community, the U.S. Department of Homeland Security, other U.S. Government civil agencies and selected commercial markets. Headquartered in McLean, Va., SAIC had annual revenues of $10.8 billion for its fiscal year ended January 31, 2010. For more information, visit www.saic.com. SAIC: From Science to Solutions(R)

**Private Entities who Verified the Intellectual Property Subject Matter of Golden's Patents and Inventions are *NOT* Frivolous by Commercializing Allegedly Infringing Products**

Golden first contacted GM/OnStar during the summer months of 2007 to ask them to participate in a Department of Homeland Security solicitation: (BAA07-02A). Golden's primary contact at GM/OnStar was Mr. Jim Culbertson. Golden asked GM/OnStar if they had the

capabilities of bringing a moving vehicle to a stall or stop. Their response was, "I need time to find out if we have the capabilities and if there is interest from upper management".

Golden never heard back from GM/OnStar, but noticed they made an announcement on October 9, 2007 of a new, "Stolen vehicle slow down" that is being offered by GM/OnStar beginning in the following year on their 2009 models. Golden called Mr. Jim Culbertson on March 27, 2008 at 11:20 a.m. at 313-665-2791. Mr. Culbertson referred Golden to Angie Miller at 313-665-1485. When Golden dialed Ms. Miller's number, the answering machine for a Michelle came on.

General Motors Corporation is the assignee of a patent (8239076) that was filed on March 31, 2008; application number 12/059893. The patent's title is; "VEHICLE SLOWDOWN CONTROL VIA SHORT RANGE WIRELESS COMMUNICATION".

On April 14, 2008, I faxed a letter to the General Motors Corporation, to the attention of Mr. G. Richard Wagoner, Jr., Chairman & CEO and to several members of the General Motors leadership team, to include, Mr. Frederick A. Henderson, President and Chief Operating Officer, Mr. Ray G. Young, Executive Vice President and Chief Financial Officer, and Mr. Robert S. Osborn, Group Vice President and General Counsel.

In responding to the DHS solicitation BAA07-02A, I asked GM/OnStar if they were capable of developing the following technology:

- a system for slowing, stalling or stopping a moving vehicle through the use of a handheld, cell phone, smart phone, PDA, laptop, desktop, or some other fixed, mobile or portable means.
- a system for slowing, stalling or stopping any and all vehicles, truck, trains, airplanes, ships or vessels.
- a system for slowing, stalling or stopping a moving vehicle and locking the vehicle doors, thereby locking any unauthorized user inside the vehicle.
- a system for slowing, stalling or stopping a moving vehicle and locking the vehicle doors, thereby locking any unauthorized user inside the vehicle through the use of long- or short-range communication, Bluetooth, cellular and/or satellite, handheld, cell phone, smart phone, PDA, laptop, desktop or some other fixed mobile or portable device.

Golden's correspondence with Apple was sent on 11/19/2010: Golden's notice letters and licensing offer was mailed U.S. Postal Service, Certified Mail to Mr. Tim Cook, Chief Operating Officer (COO) of Apple, and Mr. Bruce Sewell, SVP & General Counsel; to 1 Infinite Loop, Cupertino, CA 95014. Apple received and signed for the letters 11/16/2010. Tracking Nos: 7009 2250 0001 0170 9861 and 7009 2250 0001 0170 9854.

In Golden's notice letters; Golden is quoted as saying "[m]y technology covers electronic devices, mobile devices, authentication (biometrics) technology; mobile devices lock and unlock features, RFID reader technology for mobile devices, embedded sensors in electronic devices, embedded sensors in mobile and portable devices, mobile phones as readers, embedded sensors in cell phone cases; mobile, electronic and portable devices used as monitoring equipment for locating, tracking, navigating and status of sensors."

On 07/01/2019, Golden responded back to Apple's Krista Grewal, Counsel IP Transactions, on Golden's "Cease and Desist" request. Golden is quoted as saying: "Certain Apple Inc.'s smartphones, laptops, tablets, and smartwatches are infringing at least one patent claim of Golden's following patents: [7,385,497]; [7,636,033]; [8,106,752]; [8,334,761]; [8,531,280]; [RE43,891]; [RE43,990]; [9,096,189]; [9,589,439]; and, [10,163,287].

"Certainly, I appreciate the comment you made in defense of Apple's infringing activities in your last correspondence via email dated June 27, 2019: 'As an example, no Apple product includes detectors or indicator lights for detecting 'at least one of chemical, biological, radiological, or explosive' agents and compounds as required by the asserted patents."

"To address your comments above. Apple's smartphones; Apple's smartwatches; or Apple's smartphones interconnected to Apple's smartwatches; all, infringes at least one patent claim for a CMDC device(s) of the PO's patents listed above for chemical, biological, radiological, or explosive" agents and compounds."

"Apple has applied for patents for its smartphones and smartwatches that covers chemical and biological detection; biometric fingerprint and signature; motion sensors; and, the detection of humans. I expect Apple to submit to the USPTO an IDS to disclose my patents as prior art references for continued prosecution".

Golden's correspondence with Qualcomm. "On November 4, 2010, Golden emailed Kate Lane, Strategic IP, Qualcomm Incorporated (E-mail: clane@qualcomm.com); Direct: (858-658-2047)), to inform Ms. Lane of certain patented technology (i.e., CMDC—Smartphone—device; central processing unit (CPU); and, a Stall, Stop, and Vehicle Slowdown System for manned and unmanned electric, autonomous, and driverless vehicles). Golden asked if Qualcomm would be interested in entering into a licensing agreement with the Golden. Subject: "Patented Technology for Qualcomm's Review (copy available upon request).

Golden mailed out letters dated December 7, 2010 addressed to the attention of Qualcomm's Chairman & CEO Dr. Paul E. Jacobs and Qualcomm's EVP & President Derek Aberle, (copies of the letters and return receipts are available upon request) informing the Executives of the Golden's patented technology and asked if they would be interested in entering into a licensing agreement with Golden.

After 10 months, Ms. Lane responded back via e-mail on September 29, 2011 with, "Hi Larry, I'm just checking in to see if this portfolio is still available for purchase. Please let me know. Thank you, Kate".

On October 5, 2011, Ms. Lane responded via e-mail, "Thanks Larry, [c]an you please take a few moments to fill out the attached Patent Information Request form for this? Please let me know if you have any questions. Best regards, Kate" (copy available upon request).

On October 11, 2011, the Golden returned via e-mail, the answered Patent Information Request form to Ms. Lane. Golden made several attempts to contact Ms. Lane via e-mail and by phone after that, but never heard back from Ms. Lane.

Golden's correspondence with Intel. Intel was knowledgeable of Golden's communicating, monitoring, detecting, and controlling (CMDC) devices, CPUs and detection systems dating back to 12/2010: On 12/16/2010: Golden's notice letters and licensing offer was mailed U.S. Postal Service, Certified Mail to Mr. Paul S. Otellini, President & CEO Intel, and Mr. Curt J. Nichols, VP Intel Capital Intel, at Mission College Blvd., Santa Clara, CA 95054-1549. Intel received and signed for the letters 12/20/2010. Phone: 408-765-8080. Tracking Nos: 7010 1870 0002 0193 0360 and 7010 1870 0002 0193 0377.

Golden's correspondence with L-3 Communications was sent to the attention of Curtis Brunson; EVP, Corporate Strategy and Development on November 12, 2010. "Dear Sir: Below is a copy of an e-mail I sent Patricia R. Krall, a Vice President with L-3 Communications on

October 30, 2010. I talked with, and e-mailed Ms. Krall in January, 2007 a brief description of technology I had at that time patent pending that covered multiple sensing for CBRNE being transported inside maritime cargo containers. I asked Ms. Krall if L-3 would consider collaborating with me in responding to a DHS solicitation requesting the technology."

To: Patricia Krall, L-3 Communications. "Thanks for allowing me the opportunity to present technology that is beneficial for projects being researched and developed within the Divisions of L-3 Communications Security and Detection Systems, L-3 Communications Unmanned Systems, and L-3 Services, Inc. Please inform me if I need to also submit this proposal directly to L-3 Communications Legal or Patent Department. Ms. Krall, we had an opportunity to exchange e-mails in January, February of 2007 discussing cargo container security technology I had patent pending at the time.

**When compared to Google, Two Federal Circuit Judges Nominated by President Obama (Taranto and Stoll) Verified the Intellectual Property Subject Matter of Golden's Patents and Inventions are *NOT* Frivolous**

The Federal Circuit on 09/08/2022, in *Larry Golden v. Google LLC*; Case No. 22-1267 — "VACATED AND REMANDED" the relevant Case No: 22-1267 Document 15; back to the District Court "to be filed and request service of process".

The Federal Circuit determined the complaint, "includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "in a relatively straightforward manner" … and that the [Circuit] "express no opinion as to the adequacy of the complaint or claim chart except that it is not facially frivolous."

> "Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner …[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart.…"

**Team Collaboration Agreements with "People Skilled in the Art" who Verified the Intellectual Property Subject Matter of Golden's Patents and Inventions are *NOT* Frivolous**

**Dr. Thomas J. Bonazza**, Ph.D. Candidate Mechanical Engineering, West Virginia University 1992-Present; M.S., Electrical Engineering, Johns Hopkins University, 1991; B.S., Electrical Engineering, West Virginia University, 1986. Currently employed with Electronic Warfare Association, (EWA).

**Dr. Lonnie Johnson**, (Inventor). Dr. Johnson holds a B.S. degree in Mechanical Engineering, an M.S. degree in Nuclear Engineering, and an honorary Ph.D. in Science from Tuskegee University. Upon graduation, he worked as a research engineer at Oak Ridge National Laboratory, and then joined the U. S. Air Force, serving as Acting Chief of the Space Nuclear Power Safety Section at the Air Force Weapons Laboratory in Albuquerque, New Mexico. Currently CEO & President of Johnson R&D.

**Dr. Santosh Pandey**, Ph.D. Electrical Engineering, Lehigh University (2006), MS, Electrical Engineering, Lehigh University (2001), BTech, Electrical Engineering, Indian Institute of Technology, Kharagpur (1999), Research Interests: Bioelectronics, sensors, bioMEMS, devices, VLSI circuits, Core Area: Advanced electronics and materials, Strategic Plan Area: Bioengineering. Assistant Professor: Department of Electrical and Computer Engineering, Iowa State University.

**Harold P. Kimball Jr.** Enabling Technologies, Inc. (ETI), President Software Functional Manager / Senior Software Developer Support Systems Associates, Inc. (SSAI), Warner Robins, Georgia. Education: Bachelor of Science in Computer Science, 1990, Mercer University, Macon, Georgia. Associate of Science in Computer Science, 1987, Macon College, Macon, Georgia. Technical Skills: Machines: PCs, SUN, VAX, Alpha. Operating Environments: UNIX, VMS, MS-DOS, Novell Netware, Windows 95 & NT Software: Sybase, ORACLE, Advantage, FoxPro, Microsoft Word, TBBS bulletin board. Languages: Delphi, SQL, Ada, C, Assembly, Pascal, FoxPro, Pro*C, PL/SQL. Experience and Accomplishments: Manager / Lead Developer for the Digital Mapping Interface System (DMIS); Manager / Lead Developer for the AC-130H Gunship Part Task Trainer (pIT); Lead Developer for re-engineered Linux based APG-150 Control Unit, AC-130H Gunship; Designed and coded software (desktop and web) for the C-141 Parts Application Program Indenture (API); Designed and coded a Delphi application to manage the

AC-130H Gunship's Electrical Load Analysis (ELA) database; Designed and coded software for the Integrated Database. Designed and coded Delph applications to monitor, save and decode ML-STD-1553 messages; Designed and coded a Delphi application to track drawings and the fabrication of assemblies for the C-(4) test bench.

**Doug Erwin Cumbie**. Enabling Technologies, Inc. (ETI); Computer & Electrical Engineer. Education: BS, Electrical Engineering, University of West Florida, 2007; BS, Computer Engineering, University of Central Florida, 2001. Job-Related Skills: C# (MS Visual Studio 200312005 - desktop and mobile devices). DOS, Windows 9812000IXP, Unix. Embedded systems. Independent Projects: <u>Handheld Wireless GPS Tracking Device</u>: Designed and developed with one team member for undergraduate electrical engineering senior design course. The device consisted of a GPS module, microcontroller, LCD display, and a long-range wireless transceiver integrated into a battery powered, portable handheld unit. <u>UAV Ground Station</u>: Developed a ground control system for communicating with a remote unmanned aerial vehicle. Project was developed for the ECAAT UAV team of the University of West Florida. The software application utilizes a wireless link to provide a real-time display of the UAV's present position and onboard system information on a laptop computer. Experience and Accomplishments: Developed version 3.0 to 5.0 of the Digital Mapping Interface System for Gunships (DMISG) moving map software for AC-130H and AC-130U model gunships; Assisted in the development of a moving map software application for a Pocket PC handheld device.

**Dr. Gilbert E. Pacey**, Ph.D. (IDCAST) CBRNE Coordinator for the University of Dayton Research Institute (UDRI) Institute for the Development and Commercialization of Advanced Sensor Technology (IDCAST). Professor, Director; Miami University Center for Nanotechnology, Department of Chemistry and Biochemistry, Miami University, Oxford, Ohio 45056. Telephone: 513-529-2875 e-mail paceyge@muohio.edu. Dr. Pacey has 30 years' experience managing research projects at MU and the last 5 directing all MU research and external funding, intellectual property, and compliance issues. He is currently the CBRNE Sensors Coordinator for the Institute for the Development of Advanced Sensor Technology, IDCAST, which is a $28 million Ohio Third Frontier Wright Center for Innovation focused on sensor development. He is currently funding in THz spectroscopy and imaging (NIH) and CBRNE sensing (million Ohio Research Scholar). He has a career funding record (fund just for his group) exceeding ten million dollars.

24

**Dr. Guru Subramanyam**, Ph.D. (IDCAST) Professor, Electrical & Computer Engineering, University of Dayton Phone: 937-229-3188; Fax: 937-229-4529, E-mail: Guru.Subramanyam@ notes.udayton.edu. Education: PhD in Electrical Engineering, University of Cincinnati, 1993; MS in Electrical Engineering, University of Cincinnati, 1988; BE in Electrical & Electronics Engineering, University of Madras, 1984, (First Class). Funding: Recent Research on voltage tunable dielectrics and biopolymers: Has been a Principal Investigator (PI) in several funded projects with AFRL, AFOSR, DARPA, NASA, NSF, and Ohio Board of Regents Research Challenge Grants. Total funding as a PI exceeds $1,500,000 to date. Thin film barium strontium titanate (BST) varactor technology developed by Professor Subramanyam has been licensed by a company (Inventis Corp) resulting in a new start-up Analog Bridge Inc.

**Dr. Wolfgang U. Spendel**, Ph.D. (IDCAST) Research Scientist IDCAST/Miami University Center for Nanotechnology, Department of Chemistry and Biochemistry, Miami University, Oxford, Ohio 45056. Telephone: 513-529-8081 e-mail spendewu@muohio.edu. Education: Ph.D. Physical Chemistry, Pennsylvania State University, State College PA, 1978; BS Chemistry, Grand Valley State College, Allendale, MI, 1974; Electronics Design Associates Degree, Cleveland Institute of Electronics, 1994. Work Experience: United States Marine Corps, 1966 – 1970.

**Dr. William H. Steinecker**, Ph.D. (IDCAST) IDCAST Research Scholar. Department of Chemistry and Biochemistry, Miami University, Oxford, Ohio 45056. Telephone: 937-285-4814, Fax: 513-529-5715, e-mail steinewh@muohio.edu. Education and Training: Miami University, BS 2001; University of Michigan, MS 2003; University of Michigan, Ph.D. 2006. Publications:

- Kaanta, B.C.; Chen, H.; Lambertus, G.R.; Steinecker, W.H.; Zhdaneev, O.; Zhang, X. "High Sensitivity Micro-Thermal Conductivity Detector for Gas Chromatography," Proceedings of IEEE MEMS '09, 2009, page numbers not yet available.
- Zhong, Q.; Steinecker, W.H.; Zellers, E.T. "Characterization of a High-Performance Portable GC with a Chemiresistor Array Detector." The Analyst, 2009, 134(2), 283-293.
- Kim, H.; Steinecker, W.H.; Lambertus, G.R.; Astle, A.A.; Najafi, K.; Zellers, E.T.; Washabaugh, P.D.; Bernal, L.P.; Wise, K.D. "Micropump-Driven High-Speed MEMS Gas Chromatography System." Proceedings of Transducers '07, 2007, 1505-1508.

- Zhong, Q.; Veeneman, R.A.; Steinecker, W.H.; Jia, C.; Batterman, S.A.; Zellers, E.T. "Rapid Determination of ETS Markers with a Prototype Field-Portable GC Employing a Microsensor Array Detector." J. Environmental Monitoring, 2007, 9(5), 440-448.

The question here is, why the Trial Court Judge(s) chose not to rely on the opinions and testimony of those who are *experts* or *skilled in the art* before dismissing a case as frivolous (i.e., of little importance; trivial; lacking in seriousness; clearly insufficient on its face; not deserving serious attention; wasteful; useless; totally and completely without merit; fantastical; fanciful; unbelievable; irrational; incredible; delusional; or, lacks an arguable basis either in law or fact)?

As it stands right now the Trial Court(s) have been unashamedly wrong about the features and specifications of Golden's patented inventions. The Trial Courts' biggest fear is having to litigate who actually invented the "smartphone", knowing it will change the course of history for the World to know it was a "Black Man" who invented the smartphone. It's easier to dismiss the case as "*frivolous*".

Golden, an African-American Inventor, has twenty-seven (27) independent patent claims, and twenty (20) dependent patent claims for a Communicating, Monitoring, Detecting, and Controlling (CMDC) device (i.e., a smartphone, or a new, improved upon, and useful cell phone).

But, without seeking the opinions of experts or people skilled in the art, the NDC Judge in *Golden v. Samsung* dismissed Golden's case as having been found "frivolous" before, and that Samsung own the rights to certain functionalities

"Even if preclusion did not apply – and it does – this case must be dismissed for failure to plausibly allege infringement. Golden asserts that his "Multi Sensor Detection, Stall to Stop and Lock Disabling System" patents were infringed by: (i) "CPU's Samsung uses with its Smartphones"; (ii) Samsung's use of Global Position System (GPS) and web browsers; (iii) Samsung's use of camera lenses; (iv) Samsung's use of biometric data to unlock phones; and (v) Samsung's use of remote unlocking technology. See generally Complaint ¶ 61 & pgs. 19-26; see also id. pgs. 27-31. The allegations that his patents cover the identified functionalities included in Samsung's products are wholly unsupported and implausible on their face." Case 3:23-cv-00048-WHO Document 36 Filed 06/08/23 Page 4 of 5

Every element the NDC Court described as being "the identified functionalities included in Samsung's products", are illustrated below in Golden's independent claim 23 of Golden's '439 patent. Plaintiff's new, improve upon, and/or useful cell phone has a priority disclosure date at the USPTO of November 17, 2004:

A cell phone comprising:

a *central processing unit (CPU)* for executing and carrying out the instructions of a computer program;

a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device;

at least one of a satellite connection, Bluetooth connection, WiFi connection, *internet connection*, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or *GPS connection*;

the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and

whereupon the cell phone is interconnected to the cell phone detection device to *receive signals or send signals to lock or unlock doors*, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device;

at least one of *a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor* capable of being *disposed within, on, upon or adjacent the cell phone*; [*camera lens used for CBRNE detection*]

wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver;

wherein the cell phone is equipped with a *biometric lock disabler that incorporates at least one of a fingerprint recognition*, voice recognition, face

recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and

whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone.

Samsung's i550 mobile phone was released to Reuters on October 17, 2007. Samsung Electronics Co Ltd said its Samsung's first-ever phone incorporating a Global Positioning System (GPS). In 2010 Samsung released its first phone with fingerprint biometric technology, the Galaxy Note4. First released in June 2010, the Samsung Galaxy S ran on a 5-megapixel (MP) rear camera. A year later the Galaxy S2 featured 2 megapixels in the front and 8 megapixels in the rear [megapixel cameras are used for CBRNE detection.

The NDC Court "denied" Golden's motion for reconsideration. The NDC Court knew the statements were false, and yet, spoke with a "reckless disregard for the truth". [*malicious intent*].

## THE GOVERNMENT'S RETALIATION *NEVER* STOPPED WHICH MEANS THE GOVERNMENT'S "TAKINGS' OF GOLDEN'S PROPERTY UNDER THE FIFTH AMENDMENT CLAUSED OF THE UNITED STATES CONSTITUTION *NEVER* STOPPED

In the related case *Larry Golden v. United States*, COFC Case 1:13-cv-00307-EGB the Government ("DOJ"), on behalf of the Department of Homeland Security ("DHS"), filed Document 238 on 07/08/2021, "DEFENDANT THE UNITED STATES' NOTICE REGARDING SERVICE OF THE GOVERNMENT'S PRELIMINARY INVALIDITY CONTENTIONS":

"Defendant the United States (the Government) hereby provides notice that on Friday, June 25, 2021, the Government served its Preliminary Disclosure of Invalidity Contentions on Plaintiff, pursuant to the Court's March 29, 2021 Scheduling Order (Dkt. 221) and PRCFC 6. The Government served the Contentions a week ahead of the scheduled July 2 date, as counsel had planned vacation in conjunction with the July 4 holiday."

The Government's response to Golden's IPR-Based Takings claims was to double-down on violating Golden's procedural due process in the Government's Preliminary Invalidity Contentions by including the same three unqualified patent references of Astrin, Breed, and Mostov that does not antedate Plaintiff's patents.

| Reference | Filing Date | Publication Date | Basis for Anticipation |
|---|---|---|---|
| U.S. Patent Application Publication No. 2006/0250235 ("Astrin") | | 11/09/2006 | 102(b) |
| U.S. Patent Application Publication No. 2006/0181413 ("Mostov") | | 08/17/2006 | 102(b) |
| U.S. Patent No. 7,961,094 ("Breed") | 11/29/2007 | | 102(e) |
| *Patent Owner's First Patent Application No. 11/397,118 was filed with the USPTO* | *04/05/2006* | | |
| Reference | Filing Date | Publication Date | Basis for Anticipation |
| U.S. Patent Provisional filing date is 05/04/2005. Appl. No. 11/414,479 ("Astrin") | 04/28/2006 | | 102(e) |
| U.S. Patent Provisional filing date is 01/28/2005. Appl. No. 11/343,560; Patent No. 7,990,270 ("Mostov") | 01/28/2005 | | 102(e) |
| U.S. Patent Application filing date is 02/25/2005. Appl. No. 11/065,865 ("Garabedian") | 02/25/2005 | | 102(e) |
| U.S. Patent Provisional filing date is 05/03/2005. Appl. No. 11/418,380; Patent No. 7,656,286 ("Benson") | 05/03/2005 | | 102(e) |
| Palomar Solutions, Inc. (*I*) Publication of Subject Matter Material: 07/12/2005 | | 07/12/2005 | 102(b) |
| Palomar Solutions, Inc. (*II*) Publication of Subject Matter Material: 09/2005 | | 09/2005 | 102(b) |
| *Patent Owner's Disclosure Document filed with USPTO. Disclosure Doc. No. 565732 \** | *11/26/2004* | | |

\* The Disclosure Document Program was a service provided by the United States Patent and Trademark Office (USPTO) that allowed inventors to file a description of their invention with the USPTO in order to establish the date of the invention.

The Government's willful intent, means the Government intentionally and deliberately introduced the unqualified patent references as a means of retaliation. The Government *NEVER* stopped its efforts to "take" Golden's property; and realized the only way to delegitimize Golden's new patents asserted in the case was to introduce the same unqualified patent references.

The Defendants' persistence in retaliating, being willfully blind, and violating Golden's procedural due process has resulted in the unconstitutional "takings" of Golden's property because it was done without payment of "just compensation".

## CONCLUSION

The "Takings" of Golden's property started on *05/01/2014* when the two Defendants in the lead case, the Department of Homeland Security and the Department of Justice (i.e., the National Institute of Justice), who are not "persons" authorized to petition for PTAB to invalidate patents; submitted a petition for *inter partes review* to the PTAB to invalidate Golden's patent with three unqualified patent references, eighteen unqualified publications, and one unqualified declaration.

The "Takings" continued up to the day the Trail Court, that included the same two Defendants (DHS & DOJ) dismissed Golden's lead case COFC 13-307C without adjudicating Golden's "Unconstitutional IPR-Based "Takings" claim.

The stature of limitations is being falsely applied because within the six-year period following the PTAB final written decision *(Oct. 1, 2015)*; Golden filed in the Claims Court an Unconstitutional IPR-Based "Takings" of Property claim on *01/17/2019*. Golden filed for Summary Judgement on *11/03/2020*. The Trial Court dismissed the lead case COFC 13-307C, without adjudicating Golden's "Unconstitutional IPR-Based "Takings" claim on *11/10/2021*.

It was the Trial Court Judge himself who decided to join the "Takings" complaint filed on 01/17/2019 to the lead case. If left separate, the "Takings" claim would have already been decided, and not re-introduced because of the Trial Court's willful negligence.

Respectfully submitted,

Larry Golden

Sincerely,

s/ *Larry Golden*

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
(M) 8649927104
Email: atpg-tech@charter.net

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 11th day of July, 2023, a true and correct copy of the foregoing "Plaintiff-Appellant's Informal Appendix", was served upon the following Defendant by priority "express" mail:

Grant D. Johnson
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, DC 20530
Grant.D.Johnson@usdoj.gov
(202) 305-2513


s/ *Larry Golden*

Larry Golden, Pro Se
740 Woodruff Rd., #1102
Greenville, South Carolina 29607
atpg-tech@charter.net
864-288-5605